Olibas v. Sheriff Dodson, and we're here first, Mr. Mayor. Counsel, Judge Davis, and may it please the Court. The most important point I have to make today is the heightened standard applicable to summary judgments when the matter is free speech retaliation. I believe the Court kind of crystallized that. It's not a new principle, but this Court crystallized that about a year and a half ago in Haverda v. Hayes County, the most important features of which are as follows. First, the Court must consider all the facts and evidence in the light most favorable, in this case to Mr. and Ms. Olibas, and must disregard all the defendant's evidence that the jury is not required to believe. Second, summary judgment should be used most sparingly in First Amendment cases involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities. Third, determination of intentions or motives are unsuitable for summary adjudication. And fourth, summary judgment may be precluded  Mr. and Ms. Olibas run a mom-and-pop bail bond business out of their home in El Paso in a small office downtown, primarily servicing the ten West Texas counties comprising what's called the Trans-Pecos area. They equalize their competitive disadvantage vis-à-vis local bail bondsmen with their communication system. Collect calls from the jail are accepted by an answering service, which answers freedom bail bonds and accepts the call, of course, because the call can't be connected any other way. The operator then determines who is where the incarcerated person is and then forwards the call to the bail bondsman for that area, or the bonding agent for freedom in that area, and then she drops off the line and the conversation continues between the jailed person and the agent. She acts kind of like an operator in a receptionist in an office. Sheriff Dodson picked a fight with Mr. and Ms. Olibas. In May of 2009, he suddenly, without notifying them, stopped forwarding their calls to the answering service, blocked their calls so that the inmates just heard a recording that calls to this line have been blocked or something of that nature. But they couldn't get through, and so they go to the next bail bondsman on the list. That was not a fair fight. Mr. Olibas had to give in on that issue and give up his phone system and have the calls answered by him or the local agent on the cell phone. They could not be forwarding centrally the way they were before. A couple years later, with the advice and support of County Attorney Steve Houston, Sheriff Dodson completely barred them and their company from writing any bail bonds. In each case, I think the evidence shows that the circumstances surrounding these incidents made it appear certainly that the action was irrational and unjustified. In any case of putting them out of business, retaliatory. After the phones were disconnected and Mr. Olibas gave in on that issue, he started complaining to the county, mainly through Sheriff Dodson, but twice through County Judge Beard. During the approximate two-year periods following the telephone dispute and the ouster of his business from Brewster County, Mr. Olibas complained I think it was 18 or 20 times to the county, mainly through I think all but two of the occasions were through the sheriff and two of them were through the county jail. Eventually, he filed a lawsuit in the state court seeking only equitable relief. No attorney fees, no damages, no nothing. All he wanted to do was be able to use his phone system. During the four months leading up to his two-year ouster from business in the county, during that four-month period, Mr. Olibas did ten complaints. I think it worked out to more than two per month against the sheriff. It was at that point that the sheriff then acted. We learned later that it was the county attorney that had been involved in the decision. The sheriff sent out a letter to the bail bondsman saying, I need all this information, I need your financial statement, continuing education, and I need to know all the bonds you've written for the month of March. Well, he's the one who said these other bail bondsmen don't have adequate or are writing too many bonds or whatever. He's the one that raised the problem about the other bail bondsmen to begin with. So he's at least on this record. Yes, he mentioned that, and that's why they say be careful what you ask for. I have to say I saw that in their brief, and I said, you know, there's some truth to that. Well, certainly, and it's a popular saying, but I think it kind of blames the victim. As I explained in my reply brief, I analyzed those letters thoroughly, those letters where he supposedly asked for it, and there was only one part in there where he said, inquire into the financial sufficiency of one bail bondsman, and that was because the man had unpaid judgments against him. I think he had forfeited bonds. I think he had unpaid taxes. Well, what's wrong with the sheriff then saying, going to the county attorney, which is what you hope he would do, and saying, I've got this problem, now what? And the county attorney says you can't just single out one bail bondsman and, you know, start creating a big inquiry into him, particularly at the instance of another one. You need to treat everybody the same, which is right. And I couldn't agree more. But what the sheriff also said is if you've got a problem, then call me. Now, Mr. Olivas called the sheriff, and that's when the good-to-go conversation occurred. He told Mr. Olivas, unlike other bail bondsmen, had a financial statement he gave to the sheriff. The sheriff praised his financial statement. The sheriff in his deposition even admitted that he used the words good-to-go. Now, it is a disputed issue of fact whether the sheriff said, well, because of your financial statement, you're good to go. That makes you good to go. All you need is that financial statement. Or whether he said to Mr. Olivas, well, your financial statement is good to go, but you still have to comply with everything else. I don't think even the sheriff said he did that. The sheriff, Mr. Olivas has been very specific, though, that he left that conversation thinking, I am good to go, I don't need that list. The list would have been easy to produce. You mean the list of bonds he had outstanding? No, no, the list of bonds he had, the initial letter only asked for bonds he wrote in March. Now, that would have been easy to come up with. Now, after what even the most harsh jury would have to find was just a mistake, an honest mistake on Mr. Olivas' part, after that, then the sheriff, instead of picking up the phone and saying, hey, Pascal, I think you need to get that list of bonds in. Did you overlook that? No. He suspended him from writing other bonds, and then the county attorney, Mr. Houston, raised the ante and said all outstanding bonds. Now, all bonds written in March is simple. All bonds outstanding is very complicated. That's very difficult. That obligation was initially imposed only on Mr. Olivas. Now, over time, it was extended to other bail bondsmen, last of all to Mr. Weinacht, I think, who got a pass of over a year before he had to furnish all of his outstanding bonds. But that is a critical change that took place. And the sheriff's explanation for that was what? That the information that he did have showed such a high volume of bonds that it put him on notice that he needed to ask the next question. Well, Mr. Olivas remonstrated with him about having to disclose all outstanding bonds because of how difficult it was. And the sheriff said he just had some concerns. Now, over a year later in his deposition, he articulated a little bit of those concerns, and then he added to them in his summary judgment affidavit. But at the time that they started raising the bar, they didn't know about any outstanding bonds he'd written elsewhere. I don't believe the record shows that. But after, of course, I've told the whole story. It's almost funny, if you don't consider the consequences of it, how hard they worked to keep him out of business. He kept Mr. Olivas, to make a long story in the evidence very short, kept trying to get back into business, and they kept thinking of new requirements, new difficulties. At one point, it looked like he was pretty doggone close because they were asking him for stuff, and he was furnishing it, and it looked close. But then at the end of it, they said, Oh, wait a minute, it's been more than six months since you provided this financial information, and so you've got to go back and start over again. And I think once they, when things like that make their intentions very obvious, they ran out the clock on his request themselves. So he really was late, but certainly through no fault of his own. Now, I think the district court refused to consider later acts occurring after the filing of the lawsuit. I went through my summary of the facts, and I found, I think, 12 different things that either occurred or came to light after the lawsuit was filed. And the sheriff and the county have argued that these additional incidents should have been the subject of amended pleadings. Think about that requirement for a minute. And I know, Judge, you were on the panel in the Hoos case, Moore v. Hoos, and you talked about the importance of having pleadings about these intervening things. And when I saw that, I was happy it was unreported. But I think, look, honestly, be careful what you ask for. You may get it. I don't think the courts of this state would benefit from having a 12th amended original petition, which is kind of what we're looking at. Second, I think there's good authority from other circuits, I think, to the effect that subsequent acts can be evidence of intent. And I think that's good law, and the court should certainly find it persuasive. Is Mr. Olivas back in business? Yes, he is. Judge Janell, I don't want to say Judge Janell put him back in business, but we went down there to Pecos, had a hearing, and he heard some testimony, particularly from a bail bond expert, and he testified that I have never seen conduct like this except when a rural sheriff in a non-bail board county is trying to put somebody out of business. And the judge said, okay, I want to see counsel back in my office. And they came out with a deal. I think there may have been some arm twisting in there, but I wasn't in the room. Mr. Gonzalez was in that room, and he entered an appearance, and he's here, so maybe if you want him to. Well, but it's good. Mr. Olivas is back in action. Yes, he is. But the court made clear in responding to my motion for reconsideration that this was just a provisional matter to fix an end date for the amount of damages. I think that what he announced from the bench was never embodied in an order. Mr. Hudson and I disagreed on the form of the order. I have it over there. If you want to ask me and Mr. Hudson what that disagreement was about. But he got back. He did get back into business. He's in business now, and the sheriff is kind of like a dorm, a volcano. And he's not even—people are sending in these reports. He's not doing anything with them. He's not analyzing. Mr. Olivas has asked, hey, can you please tell me whether Mr. Weinacht is in compliance with your current— You have a red light, sir. You have a red light. Oh. Okay. Well, if there's no other questions, I'll sit down and give up the rest of it. You have some time left for a vote. Okay, thank you. Mr. Hudson. May it please the court. I apologize. I'm a little hoarse today from getting over a cold, but I'll try to speak as loudly and clearly as I can. First of all, I'd like to make a couple of preliminary comments. In a rural West Texas county like Brewster County, the county sheriff needs bondsmen. Bondsmen serve an important purpose in the county. They bond the inmates out and save the county the dollars of having to feed and house those bondsmen. At the time of these events, Brewster County had four— Well, there are other alternatives, but we have to talk about— That's correct. At the time of these events, there were four bondsmen doing business in Brewster County. The other point I want to make in this particular case, almost all of the evidence that is pertinent to summary judgment was memorialized in writings back and forth between the parties. There were summary judgment affidavits obviously tendered. Mr. Olivas' affidavit in response to the summary judgment motion mentions a single discussion over these disputes with Sheriff Dodson. That discussion happened soon after the sheriff sent this letter out in March asking for all bondsmen to qualify. The First Amendment claim was dismissed on a 12B6 motion, right? Originally, as far as the sheriff and his individual privacy, yes, sir. What do you mean originally? That's the only dismissal? Yes, that's correct. The plaintiffs' causes of action on the First Amendment are cast as follows. And I'm reading from their First Amendment complaint. The first is on the petition to—right to petition the government. They say, in the jail was an action in violation of the right to petition. I think the record is very clear that as far as complaints to a governmental official, as Mr. Milligan mentioned, there were complaints to the sheriff that originated starting back in 2009. A number of complaints about a number of issues, primarily, though, about the sheriff's action in cutting off Mr. Olivas' phone. A number that was posted at the jail as a security measure. And we'll talk about that in a minute. But the other complaints were to the county judge. In county government in Texas, the sheriff's an independent elected official. The county judge heads the commissioner's court. The county's really the keeper. The county sheriff is actually the keeper of the jail. And as you'll see in the record, the county judge pretty much steered Mr. Olivas back to the county sheriff and said, Your problem is with the sheriff. I'm the county judge. We deal with other business. But the plaintiffs proceed in saying that it was those complaints that resulted in their being cut off in May of 2011 under bond writing privileges. Those complaints being what? I'm sorry? Those complaints being the complaints to the county judge, the sheriff, or both? Both. The court, Judge Janelle, recognized both. That there were letters of complaint written to the sheriff and there were letters of complaint written to the county judge. And I recognize that in a Haverda case that this court decided in 2013, when there's disputed issues of facts or inferences, they need to go in favor of the non-movement. And that I have a very high bar in obtaining summary judgment if there are these disputes of facts. Or inferences in favor of retaliatory conduct on behalf of the sheriff. In this case, though, again, we've got letters back and forth, contemporaneous. At the time these complaints were made, we have a very clear pattern of conduct here. The disputes on the telephone system were already in litigation in state court. They are completely unrelated to this issue of testing the bondsman's security. And let me explain that. Towards the end of 2010, beginning of 2011, Mr. Olivas was writing letters about other bondsmen not being qualified, specifically about their financial statement. The county does not have a bail bonds board, so the sheriff is the one that has to fill those questions. When he started hearing concerns about the qualifications of these other bondsmen, he did go to his county attorney. He said, what do I do? And the county attorney said, let's ask for information. Let's ask for three things to qualify the bondsmen. Let's ask for their continuing education. Let's ask for a financial statement. And let's ask for a snapshot, a March 2011 snapshot, of how many bonds they wrote. We'll have an idea at that point what their liabilities are, potential liabilities are, for writing those bonds. The county attorney was not privy to these prior letters about the telephone dispute. And so he advised the sheriff, sent out a letter, sheriff did in March, and asked for these bondsmen to provide this information. He sent the same letter to all four bondsmen. You'll see it in the record. Immediately, Mr. Olivas, the very next week, according to his affidavit, called the sheriff, and they were speaking about his financial statement, which was one of the three items. And the sheriff said, your financial statement looks good. That's one of the three items you're supposed to turn over. If you read Mr. Olivas' affidavit, he says the oral, I'm sorry, it was the only oral conversation that we ever had to discuss my grievances. And the sheriff was unexpectedly cordial, telling me that you can call me at any time. If the sheriff is retaliating, why would the sheriff respond in that fashion to whom Mr. Olivas called him? Number two, attorneys are already involved. We've got a pending state court case involving a telephone dispute. Mr. Gonzalez, one of Mr. Olivas' attorneys, sent a letter in March, on March 30th, after he received a copy of the sheriff's letter, and he praised the sheriff. He says this proactive approach of the sheriff has gone a long way towards settling this lawsuit. Again, if the sheriff was retaliating, then why are both Mr. Olivas and his attorney comfortable with the actions of the sheriff in sending out this March 5th letter, asking for this information? Number three, going to the complaints to Judge Beard, kind of Judge Beard, those had happened over a year before. My third argument is, if the sheriff was retaliating because of the letters that were sent to Judge Beard, why didn't he retaliate more or less immediately? Why did he wait a year to cut off the plaintiff's bond-writing privileges? The reality is that the sheriff suspended the plaintiff's bond-writing privileges when he failed to produce one of the three requested sets of documents, and that being the snapshot of bonds that were written in March of 2010. Mr. Olivas got upset. He called the sheriff's office, and the sheriff's secretary told him that the deficiency that led to your suspension notice was that you didn't produce your list of bonds. That was memorialized in the letter that County Attorney Houston wrote back when Mr. Olivas, after learning that he had been suspended, had his lawyer to inquire as to why was my client suspended. The fight then, quite frankly, turned to the issue of whether outstanding bonds were relevant in determining a bondsman's financial sufficiency. It didn't have anything to do with your retaliating against my client. The fight turned, and you'll see it explained in Steve Houston's letter. He's the county attorney. It's in the record. I believe it was May the 10th, where Mr. Houston recites the law and recites an AG's opinion to the effect that, yes, outstanding bonds are relevant. Again, the discussion of the parties, which is memorialized fully in writing at that time, was Mr. Olivas saying that providing this list of bonds is irrelevant. I don't need to provide them. You've already got my financial statement. And the county attorney saying, yes, I need to go behind your financial statement. I need to see at least the amount of bonds you wrote in March. And the county attorney, by the time this had happened, it was in May, so the county attorney said, well, March bonds may not be a good snapshot. Let's get a list of your April bonds. And as Mr. Merrigan said, at that point, he didn't ask for a snapshot. He asked for a list of all his outstanding bonds. I think Mr. Houston probably understood that Mr. Olivas does business in a number of counties, about 14 West Texas counties. You would think in running a bail bonds business, you could hit a button on a computer and print out a list of your outstanding bonds. That's your business. That's what you do. And I don't think that there was retaliation in Mr. Houston's part in asking for that list. I think he quite frankly thought he can print out a list of outstanding bonds because he probably collects those bonds through the agents that write them, has some kind of master ledger or spreadsheet of those bonds. He can produce that information relatively easily in order to satisfy this third prong. But until he does so, he still remains suspended. So on top of the sheriff suspending Mr. Olivas on March 5th, there was a subsequent communication from the county attorney who really didn't have a dog in the hunt on the telephone issue, saying your suspensions continue until we get this list of your outstanding bonds. Again, I think the record is very clear in showing that this was not putting Mr. Olivas out of business permanently. This was, and I may have been a little too flippant when I said be careful what you ask for in my brief, and I apologize if I offended anybody by that. But Mr. Olivas was asking that these other bondsmen, that the sheriff look behind their financial statement and try to determine were they still qualified to write bonds. It's my position, it's not the appellant's position, that these outstanding bonds are contingent liabilities. The bondsman owes money to the county if the criminal defendant does not show up. And to go behind, in this case, Mr. Olivas did not list those contingent liabilities on his financial statement because he believed those were secured by indemnities that he got from family members. Because those were not on the financial statement, I think the county attorney had a good reason to ask for that. So I'd like to cast this case as, instead of putting Mr. Olivas out of business, he was suspended for what was going to be expected to be a very short period of time until he turned over his bond list. Is there any doubt that the sheriff made the same requirement on all the bonders? Great question, Your Honor. He did that. There were four bondsmen. He sent the same letter to all four. The first one, Mr. Weineck, riding out of Reeves County, sent all the information back in and the sheriff was satisfied with what he sent back. The second bondman, Mr. Rubio, didn't reply at all. So the sheriff sent him a letter saying you're suspended. The third bondsman, which is very similar in what happened here with Mr. Olivas, first asked for 30 days extension. And the sheriff's initial letter said if you need some time to get this, call me. And he did. Mr. Olivas did not. So there was a little timing difference as far as when Mr. Torres, the third bondsman, responded. He was given a 30 day delay. He originally did not, let me make sure, he turned over a list of March bonds, which showed to the sheriff that he had written a lot of bonds. So the sheriff then asked him, give me a full list of your outstanding bonds, which he did. And at that point, the sheriff said, I think you're overwritten based on the formula that me and my county attorney had discussed. So to answer your question, Your Honor, Mr. Olivas was suspended for not providing some of the information. Mr. Rubio was suspended for not providing any of the information. And Mr. Torres was suspended even though he had complied for the period it took for him to produce his entire list of outstanding bonds, not just his March 2010 snapshot. So the if you take the evidence in the totality about the retaliation for all of these letters that the sheriff has received and the letters that the county judge received, yes, those are out there. We admit those. Do they infer or show any kind of summary judgment proof that those were the basis in which the sheriff took his action? No, the sheriff has very plausible reasons to believe what he did. More importantly, the county attorney falling right in the sheriff's shoes, suspended Mr. Olivas in his letter as well. The county attorney is not a defendant in this case. Brewster County is. But it goes without mentioning that he was not the recipient in the phone dispute of all of these letters. He was an independent county attorney. Point being is that I think summary judgment evidence shows the county attorney was very focused on qualifying bondsman because the sheriff had kind of been pushed in the corner by a particular bondman saying test everyone's security. One other point on the free speech part, Your Honor, is the. And again, the Haverda case, which I think is very close to this case as far as enunciating the law and saying I've got I've got a very high standard talks about a Supreme Court case, not healthy doctrine. The Mount healthy doctrine in Haverda, it basically states that a summary judgment defendant can prevail in the First Amendment retaliation case if he would have taken that action anyway. And in this instance, I think the summary judgment evidence shows that anyone that did not comply with the sheriff's letter and producing the three sets of documents that he asked for would have been suspended, whether they complained or whether they were silent. Mr. Rubio was totally silent. He was suspended. Mr. Torres did not complain. He was suspended because at one point between the time you turn in his 30 days worth of bonds and the sheriff is waiting for his outstanding list of bonds, the sheriff put him on suspension here. I think those facts show that regardless of prior communications between the parties, if the sheriff didn't get the information that he asked for, then, as I call it, the parties were administratively suspended. Turning to the last issue, and that is still with equal protection argument. I think we've covered that. The complaint plaintiff's amended complaint says that Dodson's action in permitting others to write bonds upon their compliance with the rules of the Brewster County Sheriff's Department and even upon their failure to comply with the rules. But denying such permission to plaintiffs, despite their full compliance with those rules, is an action in violation of 14. Equal protection. And I don't think that is a correct assertion of facts. I think that the summary judgment evidence clearly shows that in this very short period of time between March and May, the sheriff sought out the advice of his county attorney. The county attorney says treat everyone equally. Wrote a letter to all four bondsmen, treating them equally, asking for the three things that he needed to do to satisfy himself that these bondsmen were qualified to write bonds. And that no one who was unqualified was going to be writing bonds. And, again, as you mentioned, Judge, I believe that the bondsmen were all treated the same. Let me ask you this. Yes, sir. There's a motion for summary judgment on the equal protection claim and on the official capacity claim. But as I understand it, there was not a summary judgment motion on the retaliation First Amendment claim. Did the parties in the court use or consider the summary judgment evidence on all three claims? The summary, the qualified immunity argument was tried on the pleadings itself. The summary judgment, though, I believe did cover the First Amendment claims and the equal protection claims. If I'm answering your question. So the motion on the pleadings was kind of surpluses? At that point, yes. I decided at that point on behalf of my client, once we got positions and developed the facts, to try to roll all of this up in a summary judgment motion. Again, Your Honor, I think we have a difference in perception, and I'll try not to go over my time. I think the plaintiffs may feel clearly that somehow they were disadvantaged insofar as the sheriff suspending their bond-writing privileges on March the 5th, 2011. We had a long fight after that as to whether bonds were relevant. We hired experts to determine whether this list of outstanding bonds were relevant. Ultimately, we did get a list of bonds in 2012, long after this case was filed. And as Mr. Milligan said, in the course of proceeding toward trial in the state court case we held with the judge, we agreed upon a formula. Another related but unrelated issue to this actual dispute was whether the sheriff was using a correct formula in determining how many bonds could be outstanding, what that aggregate liability was. Fortunately, we now have a policy in writing, which to my knowledge there is no other policy in Texas for a non-billboard county. Mr. Olivas is currently writing bonds in Brewster County. I'm happy to answer any other questions. Okay, thank you very much. Thank you. Okay, Mr. Milligan, back to you. I think an argument like you just heard that kind of skips over the facts shows the importance of the Supreme Court's recent decision in Tolan v. Cotton. Tolan v. Cotton I think is certainly different from this case. It was not a free speech retaliation. Nobody in this case ended up crippled for life the way Bobby Tolan did. And by the same token, the situation the sheriff – that the Bel Air Police Department confronted in Tolan v. Cotton was a classic case where you normally see qualified immunity granted. Outnumbered officers dealing with a ruling group of people in the dark with a stop that they made through a mistake in a typo on putting in a license plate number. I make a mistake like that every time. In every line of type I do, there's a typo. But I think what the Supreme Court said was you have to actually consider all the evidence in the light most favorable to the plaintiff. That's why I've gone to such great lengths to summarize all of the evidence in the sequence that it happened in the light most favorable to my clients because that's the light in which you must consider it. Not with skipping around among the facts but dealing with them in sequence and dealing with all of them and drawing all reasonable inferences about intent that can be derived therefrom. There's about – I think there's about 250 pages of evidence, including condensed deposition pages. And just summarizing it took 23 pages of my brief. I know it's a lot of material, but I think as far as what evidence the judge considered, just going by what I saw in the decision, it doesn't look like he considered much, if any, of it. His decision was based almost exclusively on the affidavits of Mr. Houston and Sheriff Dodson, and I don't think that's proper. He mentioned their bond rules and things like that. At one point he referred to our current formula for approving bonds. He did not mention that – he didn't say what the formula was. He wouldn't respond to Mr. Olivas, but apparently at the time of his deposition he said, well, our current formula back then was that you had to have double – your net worth had to be double your outstanding bonds. Well, standard is you can write bonds up to ten times your net worth. Both the expert witnesses testified that that was standard. The sheriff was 20 times more restrictive than that. You had to have double – a net worth equal to double your outstanding bonds. Did he apply that standard to all the bonds? No, he didn't. Mr. Weinacht, faced with that standard, claimed that he had almost a fourfold increase in his net worth over a period of about six or seven months. That's the – only by revaluing his assets and claiming they had appreciated that much in value was he able to meet that standard. So, no, it was not applied to Mr. Weinacht. The sheriff did not scrutinize that statement at all the way he did Mr. Olivas' financial information, checking and rechecking and cross-checking, according to Mr. Olivas' affidavit, which is unchallenged and must be taken as true. So, no, the sheriff did not apply it equally. There were four bondsmen originally. Three of them were put out of business. The last one standing, Mr. Weinacht, never had to give a list of all his outstanding bonds until more than a year after that requirement was first imposed on Mr. Olivas. And I don't know – I can just imagine what a banker would do with a discrepancy in financial statements like existed in this case. He asked a rhetorical question. Why would the sheriff be cordial in that conversation? Well, I think a reasonable jury could find that the sheriff saw an opportunity to mislead Mr. Olivas about what was required. He told him, you're good to go because of your financial statement. And Mr. Olivas took him at his word. So why people do things, by posing that question why, he has implicitly admitted that there are questions of intent that have to be resolved. You have a red line. Thank you very much. We have your argument and we have your case. Thank you.